PAISLEY PARK ENTERPRISES, INC., and Comerica Bank & Trust, N.A., as Personal Representative of the Estate of Prince Rogers Nelson, Plaintiffs,

v.

George Ian BOXILL, Rogue Music Alliance, LLC, and Deliverance, LLC, Defendants.

Case No. 17–cv–1212 (WMW/TNL)

United States District Court, D. Minnesota.

Signed May 22, 2017

Christopher D. Pham, Grant D. Fairbairn, Joseph J. Cassioppi, Lora Mitchell Friedemann, Fredrikson & Byron, PA, Minneapolis, MN, for Plaintiffs.

Anthony R. Zeuli, Brent E. Routman, Paige S. Stradley, Merchant & Gould PC, Minneapolis, MN, Christopher L. Brown, Brown & Rosen LLC, Boston, MA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PRELIMINARY INJUNCTION

Wilhelmina M. Wright, United States District Judge

This lawsuit involves a dispute over the ownership of previously unreleased recordings of five songs by the internationally known recording artist Prince Rogers Nelson (Prince). Defendant George Ian Boxill is a sound engineer who worked with Prince during Prince's lifetime to record and edit the five songs at issue. After Prince's death in 2016, Boxill worked with Defendants Rogue Music Alliance, LLC, and Deliverance, LLC, on a commercial release of the disputed Prince recordings in Boxill's possession. Plaintiffs Paisley Park Enterprises, Inc., and Comerica Bank & Trust, N.A., as Personal Representative of the Estate of Prince Rogers Nelson, initiated this lawsuit to enjoin Defendants from promoting and distributing the disputed recordings and to secure the return of those recordings to Prince's estate.

Plaintiffs moved for a temporary restraining order, which the Court issued on April 19, 2017. (Dkts. 30, 34.) Thereafter, Defendants filed a motion to modify the temporary restraining order and for early discovery. Plaintiffs also filed a motion for a preliminary injunction. The Court extended the temporary restraining order in a May 3, 2017 Order, which effectively granted some of the relief sought by Defendants' motion to modify the temporary restraining order. For the reasons addressed below, the Court grants Plaintiffs' motion for a preliminary injunction and denies as moot Defendants' motion to modify the temporary restraining order and for early discovery.

## BACKGROUND

Boxill is a sound engineer who worked with Prince on several music recordings

between 2004 and 2008. Plaintiff Paisley Park Enterprises, Inc., is a Minnesota corporation that Prince owned during his lifetime and is now owned by his estate. Plaintiff Comerica Bank & Trust, N.A., is the personal representative of Prince's estate.

In early 2004, Boxill was engaged as a consultant to assist in selecting and testing recording equipment for the recording studios at Prince's residence in Chanhassen, Minnesota, known as Paisley Park. Boxill executed a Confidentiality Agreement with Paisley Park Enterprises in March 2004. That Confidentiality Agreement provides that recordings and other physical materials that resulted from Boxill's work with Prince "shall remain Paisley's sole and exclusive property, shall not be used by [Boxill] in any way whatsoever, and shall be returned to Paisley immediately upon request." [1]

Boxill began recording music with Prince in 2004 and is credited as a sound engineer on Prince's album titled *3121*, which was released in 2006. In 2006, Boxill worked with Prince to record the five songs at issue in this lawsuit: "Deliverance," "No One Else," "I Am," "Touch Me," and "Sunrise Sunset." Between 2006 and 2008, Boxill edited these five recordings and communicated with Prince regarding their progress. These recordings were not released during Prince's lifetime. Boxill and Prince stopped working together regularly in December 2008.

After Prince's death in April 2016, and ten years after Boxill worked with Prince

to record the songs, Boxill mixed and edited "Deliverance," "No One Else," "I Am," "Touch Me," and "Sunrise Sunset." Boxill negotiated with representatives of Prince's estate regarding the release of these songs, but Boxill and the estate were unable to reach an agreement. In September 2016, attorneys for Boxill and for Prince's estate also jointly attempted to reach a negotiated agreement with Atlantic Records to include "Deliverance" on the movie soundtrack for *Birth of a Nation.* But the parties also were unable to reach an agreement on that contract.

In March 2017, representatives of Prince's estate learned that Boxill was planning an independent release of "Deliverance" and demanded the immediate return of any recordings of Prince in Boxill's possession. Boxill refused. Plaintiffs subsequently initiated this lawsuit in Minnesota state court, seeking possession of the disputed recordings. Plaintiffs filed a motion for a temporary restraining order in the state-court proceeding on April 14, 2017.

On April 18, 2017, Rogue Music Alliance, LLC, issued a press release announcing the April 21, 2017 nationwide release of an EP [2] titled *DELIVERANCE* that includes six previously unreleased songs featuring Prince—the five songs described above plus an extended version of the song titled "I Am." At the time of the press release, *DELIVERANCE* was available for pre-order through several online retailers, and the song "Deliverance" was available for purchase in advance of *DELIVERANCE*'s release.

1. The Confidentiality Agreement provides that the term "Paisley" includes "Paisley Park Enterprises and all its affiliated and related entities, and the confidentiality obligations to 'Paisley' hereunder shall extend and apply equally to any information or material of any kind concerning Prince Rogers Nelson or any of his family members, agents, business managers, and other representatives."

2. An EP, or "extended play," is a collection of songs shorter than an album but longer than a single. An EP generally includes eight or fewer songs. Ed Christman, *EP to the Rescue! Short Albums Are a Rare Music Business Success Story*, Billboard (Aug. 19, 2014), http://www.billboard.com/articles/business/6221881/ep-music-business-success.

Also on April 18, 2017, Boxill removed the state-court action to this Court. The next day, Plaintiffs again filed a motion for a temporary restraining order to prevent the release of *DELIVERANCE* and to secure possession of the masters and all copies of any unreleased recordings. The Court held a hearing and issued a temporary restraining order the same day. The temporary restraining order permitted Boxill and others acting in concert with him to continue distributing the song "Deliverance" but enjoined the release of the remaining songs on the *DELIVERANCE* EP, citing the Confidentiality Agreement between Boxill and Paisley Park Enterprises. The temporary restraining order also required Boxill to deliver all of the Prince recordings in his possession to Plaintiffs.

Boxill moved to modify the temporary restraining order and for expedited discovery. Plaintiffs filed an amended complaint, which added two defendants—Rogue Music Alliance, LLC, and Deliverance, LLC—and a variety of claims, including copyright and trademark violations. Plaintiffs also moved for a preliminary injunction to enjoin Defendants from selling or promoting any of the songs on the *DELIVERANCE* EP.

The Court held a consolidated hearing on the parties' pending motions. After the hearing, the Court extended the duration of the temporary restraining order, modified the temporary restraining order to require the disputed recordings to be retained by counsel for each party for use only in this litigation, and ordered Plaintiffs to post a bond.

## ANALYSIS

### I. Plaintiffs' Motion for Preliminary Injunction

#### A. Legal Standard

■ When determining whether a preliminary injunction is warranted, a dis-

trict court considers four factors: (1) the probability that the movant will succeed on the merits, (2) the threat of irreparable harm to the movant, (3) the balance between this harm and the injury that the injunction will inflict on other parties, and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). "While the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied, a finding of a likelihood of success on the merits only justifies preliminary relief if there is a risk of irreparable harm and the balance of the factors support an injunction." *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). The burden to establish the propriety of injunctive relief rests with the movant. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

#### 1. Likelihood of Success on the Merits

■ The Court first considers the probability that Plaintiffs will succeed on the merits of their claims. *See Dataphase*, 640 F.2d at 114. To demonstrate that a preliminary injunction is warranted, Plaintiffs "need only show a *reasonable probability* of success, that is, a fair chance of prevailing" on the merits. *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (emphasis added) (internal quotation marks omitted); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc) ("[W]e emphasize that district courts should still apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something

other than government action based on presumptively reasoned democratic processes."). This factor does not require a party seeking preliminary injunctive relief to prove a greater than fifty percent chance that the party will prevail on the merits. *Dataphase*, 640 F.2d at 113. Although no single *Dataphase* factor is determinative, "the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

In support of their motion for a preliminary injunction, Plaintiffs assert that they are likely to succeed on the merits of five of their legal claims—breach of contract, conversion, misappropriation of trade secrets, copyright infringement, and trademark infringement. The Court addresses Plaintiffs' likelihood of success as to each of these claims.

### a. Breach of Contract

As to the breach-of-contract claim, Plaintiffs contend that Boxill breached the Confidentiality Agreement by retaining recordings, refusing to return those recordings to Paisley Park Enterprises on demand, and attempting to exploit those recordings for his own gain at the expense of Prince's estate. Boxill counters that Plaintiffs are not likely to succeed on the merits of their breach-of-contract claim because the Confidentiality Agreement does not apply to Boxill's work with Prince as a sound engineer.

To prevail on a breach-of-contract claim under Minnesota law, Plaintiffs must prove formation of a contract, performance of any conditions precedent to the right to demand performance by the defendant, and breach of the contract by the defendant.[3] *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014). Here, the Confidentiality Agreement signed by Boxill establishes the formation of a contract.[4] Boxill's affidavit establishes that he was engaged to render services to Paisley Park Enterprises and permitted to enter Prince's homes at Paisley Park and in Hollywood, California. Paisley Park Enterprises performed its obligations under the Confidentiality Agreement when it provided Boxill the opportunity to work with Prince. In paragraph 2 of the Confidentiality Agreement, Boxill disclaims any property interest in materials connected to his work with Paisley Park Enterprises. Yet Boxill undisputedly refused to return recordings of Prince in Boxill's possession despite a demand pursuant to the Confidentiality Agreement. In addition, Boxill has released publicly and facilitated the distribution of the song "Deliverance."

Boxill argues that the plain language of the Confidentiality Agreement demonstrates that the parties could not have intended the Confidentiality Agreement to apply to Boxill's work as a sound engineer. The Confidentiality Agreement expressly provides that Boxill "shall not photograph, tape, film or otherwise record any likenesses, performances or activities of [Prince]," yet Boxill argues that he could not have performed his work as a sound engineer without violating this provision of

---

**3.** The Confidentiality Agreement, which Plaintiffs attached to the complaint, provides that it "shall in all respects be interpreted, enforced and governed by the laws of the State [of] Minnesota."

**4.** Boxill contends that Plaintiffs are unlikely to succeed on their breach-of-contract claim because the Confidentiality Agreement is not signed by a representative of Paisley Park

Enterprises. This argument is unavailing. "It is well established that the party seeking to enforce a written agreement need not have signed the agreement if [the party] agreed to the contract and acted in conformity therewith." *Taylor Inv. Corp. v. Weil*, 169 F.Supp.2d 1046, 1056 (D. Minn. 2001) (citing *Poser v. Abel*, 510 N.W.2d 224, 228 (Minn. Ct. App. 1994)).

the Confidentiality Agreement. Boxill contends that when the Confidentiality Agreement was signed, the parties did not contemplate that Boxill would ever record music with Prince. Because of the inherent inconsistencies between Boxill's work as a sound engineer and the terms of the Confidentiality Agreement, Boxill asserts, the only reasonable interpretation of the Confidentiality Agreement is that it applied only to Boxill's work as a consultant on the remodeling of the recording studios at Paisley Park in 2004.

Plaintiffs dispute Boxill's interpretation of the Confidentiality Agreement and assert that it applies, without limitation, to all of the work that Boxill performed for Prince. At the hearing on the pending motions, Plaintiffs' counsel conceded that Paisley Park Enterprises had waived the provision of the Confidentiality Agreement prohibiting Boxill from recording Prince when Boxill was hired as a sound engineer whose job was to record Prince. Despite that concession, Plaintiffs assert that the remainder of the Confidentiality Agreement continued to apply to Boxill's sound engineering work with Prince because the terms of the Confidentiality Agreement are not limited to Boxill's work as a consultant on the remodeling of Paisley Park's recording studios. Although Boxill offers a plausible interpretation of the Confidentiality Agreement, the Court cannot finally resolve the meaning of the Confidentiality Agreement on the limited record presented at this stage of the proceedings.[5] Plaintiffs' interpretation of the Confidentiality Agreement also is plausible and gives them "a fair chance of prevailing" on the merits. *See Kroupa*, 731 F.3d at 818.

### b. Conversion

Plaintiffs also assert that they are likely to prevail on their common-law conversion claim because Boxill has deprived Paisley Park Enterprises of use and possession of the disputed recordings. Minnesota law defines conversion as "an act of willful interference with [the personal property of another], done, without lawful justification, by which any person entitled thereto is deprived of use and possession" or "the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods." *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (alteration in original) (quoting *Larson v. Archer–Daniels–Midland Co.*, 226 Minn. 315, 32 N.W.2d 649, 650 (1948) and *Rudnitski v. Seely*, 452 N.W.2d 664, 668 (Minn. 1990)). Plaintiffs' theory as to conversion appears to be that the disputed recordings were created at Paisley Park, subject to the Confidentiality Agreement, and Boxill, therefore, had no legal right to take the recordings from the premises in the first instance. But through his sworn declarations with attached emails from Prince, Boxill presents testimony that his work with Prince required Boxill to take the original recordings from the studio and that Prince knew Boxill possessed the recordings. To the extent that Plaintiffs' claim to lawful ownership of the recordings is based on the Confidentiality Agreement, the likelihood that Plaintiffs can succeed on their conversion claim is closely tied to Plaintiffs' likelihood of success on their breach-of-contract claim. Based on the record presented at this early stage of the proceedings, Plaintiffs have a fair chance of prevailing on their conversion claim because Plaintiffs also have a fair

---

**5.** The Court also is mindful that Plaintiffs have initiated an arbitration proceeding against Boxill before the American Arbitration Association. If this matter proceeds to arbitration, it will be the task of the arbitrator to interpret the scope of the Confidentiality Agreement.

chance of prevailing on their claim that the Confidentiality Agreement makes them the sole owners of the disputed recordings.

### c. Misappropriation of Trade Secrets

 Plaintiffs contend that they also are likely to succeed on the merits of their misappropriation-of-trade-secrets claim. Minnesota law requires that a party seeking protection under the Minnesota Uniform Trade Secrets Act "show both the existence and the misappropriation of a trade secret." *Wilson v. Corning, Inc.*, 171 F.Supp.3d 869, 881 (D. Minn. 2016) (applying Minnesota law). A trade secret is defined as

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. § 325C.01, subd. 5 (2016). The statutory requirement that a trade secret must derive independent economic value from secrecy "carries forward the common law requirement of competitive advantage." *Electro–Craft Corp. v. Controlled Motion, Inc.*, 332 N.W.2d 890, 900 (Minn. 1983). Information creates a competitive advantage if a prospective competitor could use the information to obtain a valuable share of the market. *Id.* at 900–01.

At this stage, Plaintiffs have not demonstrated that the disputed recordings are a trade secret. Instead, Plaintiffs ask the Court to accept at face value the proposition that the recordings are a "trade secret" because they are secret. Although, as Plaintiffs suggest, the economic value of the disputed recordings *might* increase as those recordings are kept secret as a result of pent-up demand for unreleased Prince music, Paisley Park Enterprises does not derive any competitive advantage in the marketplace from the secrecy of the unreleased Prince recordings. The recordings differ fundamentally from the type of information that is subject to trade-secret protection to permit a party in possession of the information to produce a superior product. *See, e.g.*, *Wilson*, 171 F.Supp.3d at 881–83 (gas permeable cell culture technology used in development of a new product); *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F.Supp.3d 1117, 1138–40 (D. Minn. 2016) (packaging design to permit improved cooking of microwaveable food). No other artist or record company could take market share from Paisley Park Enterprises by discovering the contents of the disputed recordings. The only economic value of the recordings derives from the right to sell the recordings to the public. Certainly, the timing of any sale might affect the value of the recordings, but Plaintiffs cannot realize any independent economic value by keeping the contents of the recordings secret. Because Plaintiffs have not demonstrated that the disputed recordings are a trade secret within the meaning of the statute, Plaintiffs at this stage have not demonstrated a likelihood of succeeding on the merits of their trade-secret claim.

### d. Copyright Infringement

 Plaintiffs also assert that a preliminary injunction is warranted because they are likely to succeed on the merits of their copyright-infringement claim against each defendant. As a threshold matter, Defendants assert that Plaintiffs' copyright-infringement claim is premature because Plaintiffs have applied for copyright registrations in the disputed recordings but the Copyright Office has not yet ren-

dered a decision on those applications. Section 411(a) of the Copyright Act provides, in relevant part:

> [N]o civil action for infringement of the copyright in any United States work shall be instituted until ... registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights.

17 U.S.C. § 411(a). The United States Court of Appeals for the Eighth Circuit has not directly addressed whether a plaintiff can institute an action for infringement under the Copyright Act once the plaintiff has filed an application for copyright registration. *See Asche & Spencer Music, Inc. v. Principato–Young Entm't, Inc.*, 147 F.Supp.3d 833, 835 (D. Minn. 2015). Other circuits are divided as to whether the application for copyright registration satisfies the statutory requirement of registration of the copyright claim as a prerequisite to filing a copyright-infringement lawsuit. *See id.* (citing cases). At least one other court in this District has concluded that an application for copyright registration does not satisfy the statutory requirement of registration as a prerequisite to filing an infringement lawsuit. *Id.* at 838.

■■■ The Court need not resolve the question of whether an application for copyright registration is sufficient to permit a plaintiff to institute a civil action for copyright infringement because, based on the present record, the Court cannot conclude that Plaintiffs have any likelihood of succeeding on the merits of their copyright-infringement claim. A certificate of copyright registration is "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). Authors who create a joint work are co-owners of the copyright in that work. 17 U.S.C. § 201(a). "A co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright." *Oddo v. Ries*, 743 F.2d 630, 632–33 (9th Cir. 1984); *accord Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984) ("It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him; nor can a joint owner of a copyright sue his co-owner for infringement."). Although Plaintiffs have presented evidence that they filed applications for copyright registrations in the disputed recordings, Boxill *possesses* certificates of copyright registration for the disputed recordings that list Boxill and Prince as co-authors. Plaintiffs dispute that Prince intended to create joint works with Boxill. But at this stage of the proceedings, the Court cannot conclude that the facts stated in the certificates of copyright registration are erroneous. As a result, the Court also cannot conclude that Plaintiffs have even a "fair chance of prevailing" on the merits of their copyright-infringement claim. *See Kroupa*, 731 F.3d at 818.

### e. Trademark Infringement

■■■ Plaintiffs also contend that a preliminary injunction is warranted because they are likely to succeed on their trademark-infringement claims against Defendants Rogue Music Alliance, LLC, and Deliverance, LLC. To prevail on a trademark-infringement claim, a plaintiff must prove that the plaintiff owns a valid trademark and that a likelihood of confusion exists between the registered mark and the alleged infringing use by the defendant. *Davis v. Walt Disney Co.*, 393 F.Supp.2d 839, 843 (D. Minn. 2005). When

determining whether the use of a trademark is likely to cause confusion among consumers as to the source of an allegedly infringing product, a district court considers six non-exclusive factors: (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the alleged infringer's mark; (3) the degree of competition between the products; (4) the alleged infringer's intent to "pass off" its product as that of the plaintiff; (5) incidents of actual confusion; and (6) the type of product, the product's cost, and the conditions of purchase. *Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759–60 (8th Cir. 2005). Plaintiffs have presented evidence that Plaintiffs own the trademark "PRINCE®" for use with recordings of musical performances and that the promotional materials for the song "Deliverance" use the PRINCE® trademark.[6] According to Plaintiffs, based on Defendants' use of the PRINCE® trademark, consumers could believe that the release of "Deliverance" was authorized by Prince's estate.

Defendants argue that Plaintiffs cannot demonstrate a likelihood of success on the merits of the trademark-infringement claim because Defendants' use of Plaintiffs' trademarks in the promotion and distribution of the song "Deliverance" are nominative "fair use." But Defendants' arguments as to fair use, like their arguments regarding the interpretation of the Confidentiality Agreement, seek a decision on the merits of the parties' dispute without a fully developed factual record. Plaintiffs have established that they have a "fair chance of prevailing" on the merits of their trademark-infringement claim, which is all that is required to demonstrate a likelihood of success on the merits. *See Kroupa*, 731 F.3d at 818. That Defendants also have a colorable defense to Plaintiffs' allegations does not undermine this conclusion.

The Court's conclusion that Plaintiffs have demonstrated a likelihood of success on the merits with respect to their breach-of-contract, conversion, and trademark-infringement claims does not mean that Plaintiffs "will ultimately win." *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991) (internal quotation marks omitted). Likewise, the Court's conclusion that Plaintiffs cannot demonstrate a likelihood of success on the merits of their misappropriation-of-trade-secret and copyright-infringement claims does not mean that Defendants ultimately will prevail on those claims. *See id.* At this stage of the proceedings, however, this factor weighs in favor of granting in part Plaintiffs' motion for a preliminary injunction.

**2. Threat of Irreparable Harm**

A party seeking a preliminary injunction also must establish that the party faces a threat of irreparable harm. *See Dataphase*, 640 F.2d at 114. A possibility of irreparable harm in the absence of an injunction is not sufficient; rather, a plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). An alleged harm that can be remedied through damages is not irreparable. *See CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009).

Here, many of the harms alleged by Plaintiffs address the monetary

---

**6.** At the hearing, Plaintiffs also took issue with Defendants' use of a silhouette figure that appears to be Prince in the promotional materials for "Deliverance." The Amended Complaint, however, does not allege that the use of Prince's likeness constitutes trademark infringement, and the Court declines to address any allegations beyond those included in the Amended Complaint.

value of the disputed recordings. Although harms that are compensable in damages generally are not grounds for injunctive relief, Plaintiffs argue that injunctive relief is warranted because Defendants would be unable to satisfy an award of adequate damages. A preliminary injunction "may issue to protect plaintiff's remedy" when "the plaintiff has demonstrated sufficient evidence to support the claim that it will be unable to recover absent a preliminary injunction." *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987). Plaintiffs have stated only that the "damages in this case will be millions of dollars" and that it would be beyond the means of most individuals to satisfy a damages award of that magnitude. Although based on these assertions, it may be unlikely that Defendants would be able to satisfy a damages award in this case, this circumstance does not satisfy Plaintiffs' burden to "demonstrate[ ] a clear probability that defendants will not be able to satisfy an award of adequate damages." *Id.* The record does not include any evidence as to Defendants' assets or their ability to satisfy a judgment if Plaintiffs prevail.

To the extent Plaintiffs have alleged that the publication of previously unreleased recordings of Prince violates the Confidentiality Agreement, however, the disclosure of such confidential information cannot be adequately compensated in damages. *See*

*Hosp. Staffing Sols., LLC v. Reyes*, 736 F.Supp.2d 192, 200 (D.D.C. 2010) (stating that "the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature"). Plaintiffs assert that the right to decide whether and when to release songs that Prince recorded, but did not release during his lifetime, belongs solely to the estate. If Defendants are not enjoined from further publication and dissemination of the disputed recordings, Plaintiffs will be permanently deprived of the right to decide whether, when and in what manner the release of the disputed songs will benefit Prince's public image and reputation.[7] *See Kelly v. Primco Mgmt., Inc.*, No. CV 14-07263, 2015 WL 10990368, at *15 (C.D. Cal. Jan. 12, 2015) (concluding that the threatened deprivation of a recording artist's right to control when a song should be published, if ever, can constitute irreparable harm).

Because any further disclosure of confidential information protected by the Confidentiality Agreement threatens to irreparably damage Plaintiffs' right to control Prince's confidential information, reputation and public persona, this factor weighs in favor of granting Plaintiffs' motion for a preliminary injunction. However, because the song "Deliverance" already has been released, Plaintiffs can be compensated in damages for any ongoing harm resulting from that distribution.[8] For this reason,

---

7. Plaintiffs also assert that Defendants' "threat[s] to exploit the personal interests of a deceased person" constitute an independent basis for finding irreparable harm. Plaintiffs rely on the same authority for this contention as for their assertion that the further disclosure of information protected by the Confidentiality Agreement would permanently deprive Prince's estate of the right to control Prince's confidential information, reputation and public persona. The Court has not identified, and Plaintiffs have not provided, any authority establishing that an artist's death alters this right.

8. By the same logic, an injunction preventing the further distribution of the song "Deliverance" would not be warranted even if Plaintiffs were likely to prevail on the merits of their claim for misappropriation of trade secrets. *See Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992) (stating, in the context of a trade secret case, that a "threat of disclosure may establish immediate irreparable harm but 'further' disclosure of something already revealed cannot").

injunctive relief as to the continued sale of the song "Deliverance" based on the Confidentiality Agreement is not warranted.

Plaintiffs offer two additional arguments in support of their contention that Defendants should be enjoined from continuing to promote or distribute the song "Deliverance." First, Plaintiffs assert that their business relationship with Universal Music Group will be irreparably damaged because the release of an unauthorized song "greatly devalues the rest of the catalog." In turn, Plaintiffs contend that damage to their business relationship with Universal Music Group will irreparably damage Plaintiffs' reputation in the marketplace. But to the extent that the release of an unauthorized song has caused a loss in value of other Prince music or damaged Plaintiffs' relationship with Universal Music Group, those harms already have occurred. Plaintiffs offer no reason why the continued sale of the song "Deliverance," which has been available for sale online for weeks, will cause additional irreparable harm for which damages are not an adequate remedy.

Second, Plaintiffs argue that Defendants are using Plaintiffs' PRINCE® trademark to promote the disputed recordings, which causes customer confusion as to whether "Deliverance" was released by Plaintiffs and may damage both public perception of the disputed recordings and the consumer goodwill associated with the PRINCE® trademark. The Court agrees that Defendants' use of Plaintiffs' trademark without authorization to sell Prince's music, when Plaintiffs are not involved in the production, promotion, or distribution of that music, risks damaging Plaintiffs' reputation. *See Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F.Supp.2d 836, 845–46 (D. Minn. 2011) (enjoining former franchisee from continued use of franchisor's trademarks after termination of franchise agreement to prevent

damage to brand reputation and goodwill). But this reasoning supports only an injunction prohibiting Defendants from continuing to use Plaintiffs' trademark to sell the song "Deliverance."

Defendants contend that Plaintiffs' decision to negotiate with Boxill and Warner Brothers as to the inclusion of "Deliverance" on a movie soundtrack without disputing Boxill's co-ownership weakens Plaintiffs' claim that Prince's reputation or Plaintiffs' business relationship with Universal Music Group will be irreparably damaged in the absence of an injunction. But this argument does not undermine the Court's conclusion that an injunction is warranted to prevent Defendants' continued use of Plaintiffs' trademark or the disclosure of additional material that arguably is subject to the Confidentiality Agreement. Neither Plaintiffs' negotiations with Boxill nor Boxill's assertions that he is a co-owner of the disputed recordings give Defendants the right to use Plaintiffs' trademarks. Furthermore, nothing about Plaintiffs' negotiations with Boxill impairs whatever rights Plaintiffs have under the Confidentiality Agreement. And Boxill's claim of co-ownership, despite the Confidentiality Agreement, goes to the merits of the parties' dispute and does not undermine Plaintiffs' assertion that they will be irreparably damaged if the unreleased recordings are released but later found to be subject to the terms of the Confidentiality Agreement.

For these reasons, this factor weighs in favor of granting Plaintiffs' motion for a preliminary injunction to the extent the relief sought is based on legal claims on which Plaintiffs have established a likelihood of success on the merits.

### 3. Balance of the Equities

When deciding whether a preliminary injunction should issue, a district court also weighs the threat of irreparable

harm to the movant against the injury the injunction would inflict on other parties. *See Dataphase*, 640 F.2d at 114. Boxill asserts that he is a co-author and co-owner of the copyright in the disputed recordings and, for that reason, he has a right to publish the recordings so long as he compensates the estate for its share of the royalties. Boxill also asserts that the Confidentiality Agreement does not apply to the disputed recordings and, therefore, does not bar Defendants from distributing the recordings. But if Boxill is correct, monetary damages can compensate Boxill for any lost sales or profits. The Court has ordered Plaintiffs to post a bond, so as to compensate Defendants for any damages resulting from the injunction if later it is determined that the injunction should not have issued. If the disputed recordings are released and Plaintiffs prevail on the merits, however, Plaintiffs will have irretrievably lost the right to decide not to publish—or to be the first to publish—these songs. Consequently, the threat of irreparable harm to Plaintiffs outweighs the risk that Defendants will suffer a compensable financial loss as a result of an injunction. This factor weighs in favor of issuing a preliminary injunction.

### 4. Public Interest

■ Finally, when deciding whether a preliminary injunction should issue, the Court considers the interests of the public. *See Dataphase*, 640 F.2d at 114. The public has a strong interest in preserving the ability to enter contracts and in the availability of a forum for the enforcement of contract and property rights. *Cf. Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 94 (Minn. 1979) (acknowledging public interest in judicial enforcement of contracts). Although the competing interests at stake in this case are predominately private economic interests, because Plaintiffs have demonstrated a likelihood of success on their breach-of-

contract claim, this factor weighs in favor of issuing a preliminary injunction to preserve the availability of a meaningful remedy pending the resolution of the merits of the dispute.

### 5. Conclusion

■ On balance, the *Dataphase* factors weigh in favor of granting Plaintiffs' motion for a preliminary injunction. However, the scope of a preliminary injunction should not be greater than necessary to protect the movant until the dispute can be resolved on the merits. *See Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 790 (8th Cir. 1989). As such, the Court will not issue an injunction broader than necessary to protect Plaintiffs from irreparable harm that likely would result from additional breaches of the Confidentiality Agreement or infringement of Plaintiffs' trademark.

The Court enjoins Boxill, Rogue Music Alliance, LLC, Deliverance, LLC, and others acting in concert with them, from publishing or disseminating any previously unreleased recordings that comprise the work of Prince, including but not limited to the four-part medley titled "Man Opera" and the extended version of the track titled "I Am." The Court further enjoins Boxill, Rogue Music Alliance, LLC, Deliverance, LLC, and others acting in concert with them, from using the PRINCE® trademark in connection with the promotion and sale of the song "Deliverance." Because the Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits of misappropriation-of-trade-secret and copyright-infringement claims, a preliminary injunction is not warranted to prevent any alleged irreparable harm related to those claims. This Order preserves the parties' respective positions pending the resolution of the merits of this dispute.

## B. Bond Requirement

■■■■ Rule 65(c), Fed. R. Civ. P., provides that a district court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of the bond required by Rule 65(c) is in the discretion of the district court. *Rathmann Grp.*, 889 F.2d at 789. Defendants assert that, if Plaintiffs' motion for a preliminary injunction is granted, Plaintiffs should be required to post a bond in the amount of $1 million. Plaintiffs do not take a position on the appropriate amount of the bond but suggest that a bond in the amount that Defendants have invested in the promotion of *DELIVERANCE*—$378,000—would be adequate. But Plaintiffs' position that its damages are likely to be millions of dollars strongly suggests that a bond in the amount of $378,000 would not be sufficient to compensate Defendants if Defendants are later found to have been wrongfully enjoined. Accordingly, the May 3, 2017 Order extending the temporary restraining order required Plaintiffs to post a bond in the amount of $1 million by May 12, 2017, and Plaintiffs did so. This preliminary injunction similarly shall be secured by a bond in the amount of $1 million.

## II. Boxill's Motion to Modify the Temporary Restraining Order and for Early Discovery

After the Court issued its order granting Plaintiffs' motion for a temporary restraining order, Boxill moved to modify the temporary restraining order and for early discovery. Specifically, Boxill sought modification of the temporary restraining order to permit him to deposit the disputed recordings with the Court, a third-party escrow agent, or Plaintiffs' counsel, rather than with Plaintiffs. Boxill also sought early discovery of five categories of materials for use in responding to Plaintiffs' motion for a preliminary injunction.

To the extent Boxill's motion sought a modification of the temporary restraining order to require the disputed recordings to be deposited with Plaintiffs' counsel, rather than with Plaintiffs, pending resolution of the parties' dispute over ownership of the recordings, the motion was addressed in the Court's May 3, 2017 Order extending and modifying the temporary restraining order. The May 3, 2017 Order directed Boxill to deposit the copies of the disputed recordings in his possession with Plaintiffs' counsel for use only in this litigation and permitted defense counsel to retain a copy of the recordings for this limited purpose. This Order, which supersedes the temporary restraining order, imposes the same requirement. But because the temporary restraining order is no longer in effect upon the issuance of this Order, Boxill's motion to modify the temporary restraining order is denied as moot.

To the extent Boxill's motion seeks expedited discovery to support his response to Plaintiffs' motion for a preliminary injunction, the motion is denied as moot. Boxill sought discovery to respond to Plaintiffs' motion for a preliminary injunction, but in light of the expedited briefing schedule, it was not practical to require Plaintiffs to produce documents in time for Boxill to rely on them in his response. If any party believes that early discovery is warranted in this case for another purpose, that party may raise the issue by separate motion.

### ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED:**

1. The motion to modify the temporary restraining order and for early discovery filed by Defendant George Ian Boxill,

(Dkt. 37), is **DENIED AS MOOT**, as outlined herein.

2. The motion for a preliminary injunction filed by Plaintiffs Paisley Park Enterprises, Inc., and Comerica Bank & Trust, N.A., as Personal Representative of the Estate of Prince Rogers Nelson, (Dkt. 45), is **GRANTED** to the extent outlined herein.

3. Defendants George Ian Boxill, Rogue Music Alliance, LLC, Deliverance, LLC, and others acting in concert with them, shall not publish or otherwise disseminate any unreleased recordings that comprise the work of Prince Rogers Nelson that are alleged to be within the scope of the Confidentiality Agreement between Boxill and Paisley Park Enterprises, Inc.

4. Defendants George Ian Boxill, Rogue Music Alliance, LLC, Deliverance, LLC, and others acting in concert with them, shall deliver all recordings acquired through Boxill's work with Paisley Park Enterprises, Inc., including original recordings, analog and digital copies, and any derivative works, to Plaintiffs' counsel—not Plaintiffs—for use only in this litigation. Counsel for Defendants may retain a copy of any recordings deposited with Plaintiffs' counsel for use only in this litigation.

5. Defendants George Ian Boxill, Rogue Music Alliance, LLC, Deliverance, LLC, and others acting in concert with them, shall cease the use of the trademark PRINCE® in connection with the promotion, sale, and distribution of the song "Deliverance."

6. The preliminary injunction issued by this Order shall be secured by a bond in the amount of $1,000,000 posted by Plaintiffs Paisley Park Enterprises, Inc., and Comerica Bank & Trust, N.A., as Personal Representative of the Estate of Prince Rogers Nelson.