# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-2843

_____

Greg Kroupa, guardian ad litem of B.K., a minor

*Plaintiff - Appellee*

v.

Peter A. Nielsen, individually and in his official capacity as Assistant Director of
4-H Youth Development; Rod Geppert, individually and in his official capacity as
Brule County Extension 4-H representative

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: June 13, 2013
Filed: September 25, 2013

_____

Before LOKEN, BRIGHT, and BYE, Circuit Judges.

_____

LOKEN, Circuit Judge.

Giving no notice or opportunity to be heard, a secret committee of the South
Dakota State University ("SDSU") Cooperative Extension Service barred B.K., a 15-
year-old member of the South Dakota 4-H program, from further showing livestock
at 4-H exhibitions. The letter advising of this decision stated that the punishment was

imposed because B.K. "misrepresented the ownership" of her winning swine entry at the 2011 South Dakota State Fair. B.K.'s father, Greg Kroupa, commenced this 42 U.S.C. § 1983 action, including as defendants the unincorporated 4-H Association and two 4-H officials, Peter A. Nielsen and Rodney Geppert, who communicated this punishment to the Kroupas and refused their request that B.K. be allowed to appeal the adverse decision.

Based on evidence that the South Dakota 4-H program is part of SDSU and controlled by its Board of Regents, see S.D. Codified Laws §§ 13-54-1, 13-54-9, the district court[1] dismissed the institutional defendant and official capacity damage claims against Nielsen and Geppert on grounds of sovereign immunity. Those issues are not before us. The court then granted Kroupa preliminary injunctive relief from the claimed denial of B.K.'s constitutional right to procedural due process. Applying well-recognized preliminary injunction standards, see Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc), the court enjoined Nielsen and Geppert, acting in their official capacities, "from interfering with B.K.'s participation in any 4-H activities until further order of the court." Kroupa v. 4-H, 877 F. Supp. 2d 804, 823 (D.S.D. 2012).

Defendants appealed and moved for a stay of the injunction pending appeal. In opposition, Kroupa submitted evidence of the harm B.K. would have suffered had she not been allowed to compete in the 2012 season. The district court denied the stay in a thorough second opinion which defendants did not appeal. 877 F. Supp. 2d at 823-27. However, defendants continued their appeal of the preliminary injunction order, without seeking a stay from this court. The 2013 livestock exhibition season has now come and gone. The district court docket sheets reflect on-going summary

---

[1]The Hon. Karen E. Schreier, United States District Judge for the District of South Dakota.

judgment proceedings in the district court. Reviewing the grant of a preliminary injunction under the <u>Dataphase</u> standards, we affirm.

## I.

At the preliminary injunction hearing, Kroupa as moving party presented testimony by four witnesses and five documentary exhibits. We briefly summarize the lengthy testimony:

Kroupa testified that his family breed, raise, and show livestock in Brule County, South Dakota. His four children have successfully participated in 4-H and other livestock competitions in South Dakota and elsewhere. B.K., the youngest child, joined 4-H when she was eight years old. She has won more than $20,000 in prize money from livestock shows, including $22,000 for showing the reserve champion steer at a livestock show in Louisville in 2009. B.K. testified she plans to use that money for college and has stopped participating in sports to devote her time to raising and training animals. She hopes eventually to take over the family livestock business.

Beginning in April 2011, B.K. trained a belted barrow swine, which she named "Moe," for entry in livestock shows. B.K. showed Moe at the Brule County Fair in August. She qualified for the South Dakota State Fair from September 1 to 6. Moe won reserve grand honors in the 4-H division followed by the champion market barrow prize at the Future Farmers of America show at the conclusion of the State Fair. After the fair, several members of B.K.'s 4-H club accused her of cheating, claiming the pig she showed at the State Fair was not Moe but another belted barrow swine with a cauliflower ear that had come from another state fair.[2] The repeated

---

[2]Moe had a visible ear deformity common to pigs, called "cauliflower ear."

messages and emails were so abusive and distressing that B.K. deleted her Facebook page and complained to her parents.

Later in September, Kroupa contacted Geppert, the Extension Officer for Brule County, to discuss how to stop the abuse of his daughter. Kroupa testified Geppert said he would talk to Nielsen and the two "would get back to me." Nielsen did so and said "if I would help them with the problems, that I would be asked to be on the ethics committee, and to try to . . . stop the dishonesty that was going on at the fairgrounds." Kroupa said he responded to Nielsen, "A simple solution to your problem is implementing DNA" sampling of the champions, as is common in other States.

Kroupa testified that his next contact was when B.K. received the October 3 decision letter signed by Nielsen as Assistant Director, 4-H Youth Development, for the South Dakota Cooperative Extension Service. The letter stated:

> This letter is to inform you that you will no longer be allowed to participate in South Dakota 4-H exhibition programs. . . . After being shown pictures on September 9, 2011, your father, Mr. Greg Kroupa, admitted to Mr. Rod Geppert and then, to Mr. Peter Nielsen that you have not owned or cared for your recent swine entry for the project season. He also admitted that your swine entry had been submitted and competed in this year's Missouri State Fair. The South Dakota 4-H Livestock Ethics Committee met on September 20, 2011 and concluded that you misrepresented the ownership of this animal and violated the code of ethics.
>
> Based on the events surrounding the misrepresentation of ownership . . . the State 4-H Office has permanently removed you from the South Dakota 4-H exhibition program and any future eligibility or participation in such programs. In addition, you are ineligible to receive any awards or premium monies from the 4-H Swine Project or 4-H Beef Project areas on the 2011 South Dakota State Fair.

Kroupa testified that neither he nor B.K. was notified of the September 20 meeting or even that a Livestock Ethics Committee was considering this punishment. After B.K. received the letter, Kroupa drove to Brookings to "see if I could visit with Peter Niels[e]n." Nielsen told him the decision was final; there could be no appeal. He declined to identify the members of the Livestock Ethics Committee. B.K. and Kroupa directly denied the allegations in the October 3 letter. Kroupa denied being shown pictures on September 9. B.K. testified that she raised and trained Moe in 2011 and that Moe was the prize winning pig she showed at the State Fair. B.K. further testified that she was not provided notice of the Livestock Ethics Committee meeting, was never given an opportunity to respond to charges she had cheated at the State Fair or misrepresented animal ownership, and never even spoke with Nielsen before or after he sent the October 3 letter.

Kroupa testified that, but for the ban, B.K. would have been eligible to participate in 4-H programs until she turns 19 in December 2014. Although the 4-H ban does not preclude her from participating in competitions sponsored by other organizations, such as the Future Farmers of America, or "open" competitions that have no age restrictions, some shows ban competitors who have been declared ineligible by 4-H. After the ban, B.K. continued to participate in other 4-H activities. However, when she tried to participate in a 4-H "weigh-in" event in May 2012, an SDSU Extension Officer weighed B.K.'s animal but refused to sign the weight slip, and Nielsen wrote Kroupa that "[p]articipation at this weigh-in does not change the status of any other 4-H eligibility decisions."

After Kroupa and B.K. testified, Dawn Cable, an adult 4-H leader in Brule County for over twenty years and a 4-H member since she was eight years old, testified that she was advised by Geppert that B.K. "was banned from 4-H" shows and that she had never "heard of anything like this before." Chris Hauger, who competes

with Kroupa in raising show pigs, testified that, one week before the State Fair, he was in the Kroupa "show barn" and saw Moe, the barrow pig with a "crimped" ear.

Prior to the hearing, defendants submitted an affidavit by Nielsen averring that the decision to bar B.K. from participation in 4-H livestock shows "was based upon a thorough investigation by myself and Rod Geppert, which resulted in strong evidence . . . that B.K. had shown a swine in the South Dakota State Fair that had previously been shown in the Missouri State Fair," a fact Greg Kroupa admitted "when I confronted [him]." At the hearing, defendants briefly cross examined Kroupa's witnesses but offered *no* additional evidence. Thus, the preliminary injunction record on appeal is, by defendants' choice, factually one-sided. After briefing and oral argument, the district court granted the preliminary injunction. On appeal, defendants cite facts submitted by Kroupa in opposing their motion for a stay pending appeal. But defendants did not appeal the denial of that motion, so these subsequent events are not part of the preliminary injunction record on appeal.

## II.

"Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase, 640 F.2d at 113. A district court has broad discretion in ruling on requests for preliminary injunctions; "we will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion." Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 803 (8th Cir. 2003).

A. Likelihood of Success on the Merits. On appeal, defendants primarily argue the district court erred in concluding that Kroupa made an adequate showing of the threat of irreparable harm. That is a logical focus because irreparable injury

-6-

must be shown to obtain a preliminary injunction.  See, e.g., Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003).  But in this case, the question of irreparable injury is tied to the merits of Kroupa's procedural due process claim, so we will begin with the likelihood-of-success factor.  The secret deliberations of SDSU's undisclosed Livestock Ethics Committee were not "government action based on presumptively reasoned democratic processes."  Therefore, Kroupa need only show a reasonable probability of success, that is, a "fair chance of prevailing" on B.K.'s procedural due process claim.  Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).

Procedural due process constrains government decisions "which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."  Mathews v. Eldridge, 424 U.S. 319, 332 (1976).  Thus, a § 1983 procedural due process claim turns on (1) whether the state actor's decision impacted a protected liberty or property interest, and if so, (2) what process was constitutionally "due."  Id. at 332-33.

1.  Protected Interest.  The predominant injury to B.K. at issue in this case was the harm to her reputation for honesty and integrity when she was publicly banned from government-sponsored 4-H activities for cheating.  A person's reputation, alone, is not a protected liberty or property interest.  But state action that both damaged a person's reputation and "distinctly altered or extinguished" a "right or status previously recognized by state law," removing that interest "from the recognition and protection previously afforded by the State [is] sufficient to invoke the procedural guarantees contained in the Due Process Clause of the Fourteenth Amendment."  Paul v. Davis, 424 U.S. 693, 701, 711 (1976).  Determining whether a government benefit conferred an interest that was "more than an abstract need or desire" begins "with a determination of what it is that state law provides."  The critical question whether what state law provides rises to an interest protected by the Due Process Clause of the

Fourteenth Amendment "is ultimately one of federal constitutional law." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756-57 (2005).

The loss of public employment has been the "interest" at issue in most of our cases that focused on reputational injuries. See, e.g., Neal v. Fields, 429 F.3d 1165, 1167-68 (8th Cir. 2005). But public employment is not the only "right or status" conferred by state law that may warrant this procedural due process protection. See Paul, 424 U.S. at 708-09, discussing Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971); Brown v. Simmons, 478 F.3d 922, 923 (8th Cir. 2007); Gunderson v. Hvass, 339 F.3d 639, 644-45 (8th Cir. 2003), cert. denied sub nom Gunderson v. Fabian, 540 U.S. 1124 (2004). When state actors deprive a person of a significant right or status conferred by state law based upon their public determination that the person was guilty of "dishonesty, immorality, criminality, racism, and the like," that person may well be entitled to the minimum requirements of procedural due process. Mercer v. City of Cedar Rapids, 308 F.3d 840, 845 (8th Cir. 2002) (quotation omitted); see Goss v. Lopez, 419 U.S. 565, 574-76 (1975).[3]

The threshold issue, therefore, is whether participation in the state-sponsored 4-H organization and its livestock competitions is a sufficient "right or status" under state law to be protected by the Due Process Clause. SDSU's Cooperative Extension Service is in part federally funded. See 7 U.S.C. §§ 342, 343(b)(1). "4-H clubs" are explicitly included in the "food and agricultural sciences" that are federally supported. 7 U.S.C. § 3103(9)(L).[4] The purpose of the Extension Service is to give "instruction and demonstration in agriculture and home economics to persons not attending [SDSU]." S.D. Codified Laws § 13-54-1. SDSU's 4-H program teaches

---

[3]Allegations of dishonesty, such as cheating, can form the "requisite stigma" in determining whether B.K. had a protected liberty interest. Gibson v. Caruthersville Sch. Dist. No. 8, 336 F.3d 768, 773 (8th Cir. 2003).

[4]It is a federal crime to wear or display "the sign or emblem of the 4-H clubs" with intent to defraud. 18 U.S.C. § 707.

-8-

children agriculture and leadership skills through a variety of activities, including competitive livestock shows, and children may participate in the South Dakota 4-H until they are 19 years old. The record does not disclose -- by defendants' choice -- whether and on what conditions participation in 4-H is open to all South Dakota children.

Given the statutory purpose and federal funding, we think it fair to infer that 4-H membership and participation is a "right or status" open to all South Dakota children interested in a career in agriculture, subject to reasonable, non-discriminatory terms. The record clearly demonstrates that the ban deprived B.K. of the opportunity to participate in a public program that was important to her education and career development and from which she had obtained significant personal income. Although the issue is not free from doubt, on this record the district court did not abuse its discretion in concluding that B.K. has a fair chance of proving that defendants published a defamatory ruling that deprived B.K. of a right or status conferred by state law and therefore she is entitled to the constitutional protection of the Due Process Clause. The state-created status here at issue is far more than the expectation of possibly winning a prize or award at a particular exhibition.

Defendants argue that participation in 4-H activities is no more constitutionally protected than participation in interscholastic athletics or extracurricular school activities that have been denied protection in cases such as Walsh v. La. High Sch. Athletic Ass'n, 616 F.2d 152, 159-60 (5th Cir. 1980), cert. denied 449 U.S. 1124 (1981); see In re United States ex rel. Mo. State High Sch. Activities Ass'n, 682 F.2d 147, 153 n.8 (8th Cir. 1982). But the analogy is not apt and the governing principles far from clear. More analogous, in our view, are cases concluding that students are entitled to the protection of at least minimal procedural due process before they can be punished for misconduct by being banned from college athletics "which have the potential to bring them great economic rewards." Behagen v. Intercoll. Conf. of Faculty Reps., 346 F. Supp. 602, 604 (D. Minn. 1972). We considered this issue

"uncertain" and did not address it in resolving the preliminary injunction appeal in Regents of the Univ. of Minn. v. N.C.A.A., 560 F.2d 352, 366 n.22 (8th Cir. 1977). Here, B.K. had similar interests in protecting her reputation for honesty, her immediate interest in training livestock and competing for cash prizes and awards, and her future economic interest in a career in agriculture. 4-H participation, unlike most high school athletics, is a career-oriented program.

2.   Whether Sufficient Process Was Provided.  If B.K. had a constitutionally protected liberty or property interest in continued 4-H participation, without question she was not afforded even minimal procedural due process protection.  Indeed, she was afforded *no process at all*.  Due process is necessarily a flexible concept that depends on the nature of the interest and the severity of its impairment.  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333 (quotation omitted).  Here, B.K. was afforded no notice that punishment was even being considered until after it had been imposed, and no opportunity to be heard either before or after the punitive action was taken, even when Kroupa traveled to Brookings and implored Nielsen to provide his daughter an appeal procedure. Kroupa's chance of success on this aspect of the merits inquiry is not "fair," it is a virtual certainty.[5]

B. Threat of Irreparable Harm.  The district court concluded that Kroupa made an adequate showing of the threat of irreparable harm to B.K. because being banned from 4-H programs harms B.K.'s chance to win money awards, which she has won in the past; deprives her of the educational opportunity to show animals, significant

_____

[5]The district court apparently ruled that B.K. has a federal constitutional right to the procedural protections afforded by the South Dakota Administrative Procedure Act,  S.D. Codified Laws §§ 1-26-1 et seq.  See 877 F. Supp. 2d at 820.  We do not affirm this ruling.  State law does not define the federal constitutional process due. Thus, a claim that B.K. is entitled to relief under the South Dakota APA would be a pendent state law claim.  No such claim was pleaded.

-10-

to her hopes for a career in agriculture; and tarnishes her reputation for honesty as evidenced by the "disdain" of her peers following the 2011 State Fair. 877 F. Supp. 2d at 821-22. Because damage to one's reputation is a harm that cannot be remedied by a later award of money damages, the threat of reputational harm may form the basis for preliminary injunctive relief. United Healthcare Ins. Co. v. AdvancePCS, 316 F.3d 737, 741 (8th Cir. 2002).

On appeal, defendants first argue the district court was wrong to ignore many cases from other jurisdictions holding that being excluded from participating in extracurricular school activities is not irreparable injury. We have already explained why the status of 4-H membership granted under South Dakota law, including the ability to participate in 4-H activities, may well be both professionally and economically different than most school athletics and extracurricular activities. When we add the inherently defamatory nature of the public punishment 4-H inflicted on B.K. -- without the fairness of notice and an opportunity to be heard -- we agree with the district court that these school activity cases, even if soundly reasoned, are distinguishable.

Defendants next argue that winning livestock competitions is speculative in nature and therefore the district court erred in determining that loss of prize money can constitute irreparable harm. This contention gives the prize money factor far more significance than it deserves. We can agree that the 4-H prize money is rather insubstantial (though perhaps not to a teenager saving to finance her college education), and that losing the chance to compete for a prize in a particular livestock show would doubtless not constitute irreparable injury. But the injury to B.K. in this case included loss of educational and professional opportunities and the reputational injury resulting when state actors publicly imposed a three-year ban based upon their finding she was guilty of dishonest, unethical conduct.

Turning at last to the critical issue of reputational injury, defendants argue they were not responsible for any injury to B.K.'s reputation because the hurtful text messages, emails, and Facebook postings were sent by individual 4-H members. This contention misstates the relevant inquiry. The injury to B.K.'s reputation at issue is B.K.'s banishment from 4-H competitions for the rest of her years of 4-H eligibility because she had cheated at the State Fair, a decision defendants promptly published when Geppert communicated it to Dawn Cable, the adult leader of B.K.'s local 4-H club. The prior taunting by B.K.'s peers demonstrated how damaging this official 4-H decision would be to the reputation of a teenager aspiring to a career in agriculture. Defendants' defamatory state action served to confirm and validate what would otherwise have been peer rumor and suspicion.

Citing cases from other jurisdictions for the proposition that "self-inflicted" harm does not warrant a preliminary injunction, defendants add as a "final point" to this argument that B.K.'s reputational injury resulted from the self-inflicted harm of "showing a swine at the South Dakota State Fair that [she] did not own and care for," violating "4-H's ethical rules." This argument shows a total failure to comprehend the principles of fairness that underlie procedural due process protections. And the argument comes from a party that declined to offer proof that its secretive decision-making reached a fair and accurate result in publicly declaring B.K. dishonest.

Finally, defendants argue that Kroupa did not warrant preliminary injunctive relief because his delay in seeking the injunction until June 2012 "militates against any finding of irreparable harm." However, the testimony by Kroupa's witnesses established that he sought a preliminary injunction before important South Dakota livestock competitions occurred in the summer and fall of 2012, the first exhibition season following the 4-H ban. With no showing from defendants they were prejudiced by the delay, the district court did not abuse its discretion in concluding that delay was not a sufficient basis to deny preliminary injunctive relief.

For these reasons, we conclude the district court did not abuse its discretion in deciding that Kroupa made a sufficient showing of the threat of irreparable injury, particularly to B.K.'s reputation, to warrant the grant of a preliminary injunction.

C.  Balance of the Equities and The Public Interest.  Defendants argue the district court erred in weighing these factors because it failed to consider that B.K. could still enter competitions sponsored by organizations other than 4-H, and disregarded the harm to 4-H and the public if 4-H ethical rules are not enforced.

The district court explicitly weighed the competing educational and financial harm to B.K. if she was not allowed to compete and ultimately prevailed on the merits at the end of protracted litigation, against the harm to 4-H and the public interest if a preliminary injunction was granted and it is ultimately determined that B.K. was allowed to compete for prizes to which she was not entitled.  877 F. Supp. 2d at 822-23.  This weighing was within the sound discretion of the district court.  We add two observations.  First, the damage to B.K.'s reputation from this defamatory state action overwhelms the balance-of-harms factor.  Being publicly labeled a cheat by a well-respected government institution without a chance to be heard would be devastating to anyone, and certainly to a teenager committed to benefitting from 4-H membership and activities.  Second, the injunction by its terms lasts "until further order of the court."  It remains within defendants' discretion to promptly give B.K. whatever "process is due," rather than await a final disposition of Kroupa's procedural due process claim on the merits, if in defendants' view that would best serve the public interest in 4-H government-sponsored activities.[6]

---

[6]We readily acknowledge the public interest in enforcing rules that prevent cheaters from receiving 4-H-sponsored awards and prize money.  But that interest is served by excluding true cheaters, not by punishing those who are falsely accused or suspected of cheating.  In this regard, the public interest argued by 4-H is the *same* public interest that counsels in favor of affording an accused procedural due process.

In sum, the district court did not abuse its discretion in weighing the Dataphase factors and granting the preliminary injunction. Accordingly, its order dated July 12, 2012, is affirmed.

BYE, Circuit Judge, dissenting.

In my view, B.K. has not demonstrated a likelihood of success on the merits nor a threat of irreparable harm. I would reverse the decision of the district court and vacate the preliminary injunction.

B.K. has not demonstrated a fair chance of prevailing on the merits of her procedural due process claim because she was not deprived of a protected liberty or property interest. The primary injury alleged by B.K. is the harm to her reputation for honesty and integrity. Yet, an individual's reputation, alone, is not a protected liberty or property interest. Neal v. Fields, 429 F.3d 1165, 1167 (8th Cir. 2005) (citing Siegert v. Gilley, 500 U.S. 226, 233-34 (1991)). It must be coupled with the deprivation of a "right or status previously recognized by state law." Paul v. Davis, 424 U.S. 693, 711-12 (1976). The majority concludes participation in the 4-H organization and its livestock competitions is a recognized right or status because it is important to B.K.'s education and career development.

Defendants logically argued participation in 4-H activities is no more constitutionally protected than participation in interscholastic athletics. Extensive case law supports such position. See Doe v. Silsbee, 402 Fed. App'x 852, 854 (5th Cir. 2010) (holding student had no liberty or property interest in participating in cheerleading squad); Angstadt v. Midd-West Sch. Dist., 377 F.3d 338, 344 (3d Cir. 2004) (holding student had no liberty or property interest in participating in interscholastic athletics); Brindsi v. Regano, 20 Fed. App'x 50, 512 (6th Cir. 2001) (same). However, the majority rejects this argument, concluding the analogy to high school athletics "is not apt and the governing principles far from clear." Ante at 9.

-14-

The majority ignores this case law, concluding a single district court case from 1972, Behagen v. Intercollegiate Conference of Faculty Representatives, 346 F. Supp. 602 (D. Minn. 1972), which involved a ban from college athletics, is more analogous because the activity had a "potential to bring [participants] great economic rewards." Ante at 9. The majority's reasoning relies on this lone district court case even though multiple circuits have held college students do not have a protected liberty or property interest in intercollegiate athletics. See Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 109 (4th Cir. 2011) ("[T]he interest of the student athletes in participating in intercollegiate sports was not constitutionally protected"); Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 615 (6th Cir. 2002) ("There is no constitutional right to participate in intercollegiate athletics."); Colo. Seminary v. Nat'l Collegiate Athletic Ass'n, 570 F.2d 320, 321 (10th Cir. 1978) (same). These cases, and those offered by Defendants, demonstrate the aptness of the analogy and the clarity of the governing principles in this area.

I also note Behagen appears to have based its ruling on an erroneous belief that the law in 1972 was evolving towards recognizing a protected interest in intercollegiate athletics. In the sentence immediately preceding the one quoted by the majority, Behagen stated, "[i]t has also been held that high school students' interests in participation in athletics are so substantial that they cannot be impaired without proceedings which comply with minimum standards of due process." 346 F. Supp. at 604. The relevant case law did not evolve in the direction Behagen anticipated, so reliance on Behagen underscores the deficiency of the majority's reasoning.

The majority suggests 4-H differs from high school athletics because "4-H participation, unlike most high school athletics, is a career-oriented program." Ante at 10. First, the majority fails to acknowledge the thousands of high school athletes who vie for and receive collegiate scholarships, which undoubtedly have a significant impact on those students' "future economic interests" and career development. It is unclear to me how the opportunity to compete for an athletics scholarship differs from

-15-

the opportunity to compete for prize money from livestock shows, especially when, as the majority notes, B.K. plans to use the prize money for college. A college scholarship would undoubtedly affect a high school student's career path.

Further, the majority fails to reconcile its position with the numerous other extracurricular activities which also are career oriented and important to one's education but nevertheless have been held to not constitute protected interests. See Lowe v. City of Shelton, 128 Fed. App'x 813, 814 (2d Cir. 2005) (holding high school student did not have a protected property interest in creating an official jazz club at school); Seamons v. Snow, 84 F.3d 1226, 1234-35 (10th Cir. 1996) (holding student did not have constitutional right to participate in sports, to take advanced placement classes, or to attend a particular school); Poling v. Murphy, 872 F.2d 757, 764 (6th Cir. 1989) (holding student had no protected interest in participating in student council election even though it was customary to award a college scholarship to the council president). I fail to see how participation in 4-H differs from these other extracurricular activities, or from the many other activities which also provide educational opportunities and can impact career development.

The majority relies on Goss v. Lopez, 419 U.S. 565 (1975), in which the Supreme Court held that students have a property interest in public education. However, in Goss, the Court spoke in terms of the total "education process." Id. at 576, 579. "Therefore, under Goss, the property interest which is protected by the Due Process Clause is the right to participate in the entire educational process and not the right to participate in each individual component of that process." Mazevski v. Horseheads Cent. Sch. Dist., 950 F. Supp. 69 (W.D. N.Y. 1997); see also Jeffrey v. Bd. of Trs. of Bells Indep. Sch. Dist., 261 F. Supp. 2d 719, 725-26 (E.D. Tex. 2003). B.K. would need to be afforded due process protection only if she had been excluded from the entire educational process. Here, she was merely excluded from an individual component, 4-H. Thus, reliance on Goss is not helpful.

-16-

Neither has B.K. demonstrated a threat of irreparable harm. Much of that analysis would mirror my discussion of B.K.'s procedural due process claim. I would add the possibility of winning livestock competitions is speculative and any actual economic losses have an adequate remedy at law. S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist., 696 F.3d 771, 779 (8th Cir. 2012). Finally, B.K.'s delay in seeking preliminary injunctive relief undercuts the severity of any threatened harm and weighs against the district court's decision to grant a preliminary injunction. Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 603 (8th Cir. 1999).

Weighing the Dataphase factors, I do not believe B.K. has demonstrated a likelihood of success on the merits of her claim nor demonstrated the threat of irreparable harm and, thus, is not entitled to injunctive relief.

For the foregoing reasons, I respectfully dissent.

_____