# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2552
_____

John Does 1-2; John Does 4-11

*Plaintiffs - Appellants*

v.

Regents of the University of Minnesota; Eric W. Kaler; Tina Marisam

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: November 12, 2020
Filed: June 1, 2021
_____

Before SMITH, Chief Judge, LOKEN and GRUENDER, Circuit Judges.
_____

LOKEN, Circuit Judge.

Ten former University of Minnesota football players appeal the dismissal of their Amended Complaint against the University and two University officials, asserting a variety of claims arising out of the University's investigation of a complaint of sexual assault and harassment by another student, Jane Doe. The Amended Complaint referred to the plaintiffs as "John Does 1-2; John Does 4-11." Like the parties, we will refer to them collectively as "the Does" and individually as

a "JD," for example, "JD1." The Does are African-American males who allege that the University targeted them on the basis of their sex and race and unfairly punished them in response to Jane's accusations. The district court dismissed all claims under Fed. R. Civ. P. 12(b)(6). On appeal, the Does argue their Amended Complaint stated plausible claims of sex discrimination and retaliation in violation of 20 U.S.C. §§ 1681 *et seq.* ("Title IX"), race discrimination in violation of 42 U.S.C. §§ 2000d *et seq.* ("Title VI") and the Equal Protection Clause, and violations of their constitutional right to procedural due process. They also argue the district court erred in granting the University Eleventh Amendment immunity from the Does' state law claims of breach of contract and negligence. We review these issues *de novo*. See Doe v. Univ. of Ark.-Fayetteville, 974 F.3d 858, 864 (8th Cir. 2020). We conclude the district court correctly dismissed all claims except the Does' plausible claims of Title IX discrimination on the basis of sex. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## I. Background

As we are reviewing a Rule 12(b)(6) dismissal, we draw the following facts from the Amended Complaint, accepting all factual allegations as true and in the light most favorable to the Does to determine whether they state facially plausible claims. See Walker v. Barrett, 650 F.3d 1198, 1203 (8th Cir. 2011). Thus, the following narrative is necessarily one-sided and favorable to the Does. We of course do not assume that the Does will be able to prove what they plausibly allege.

In the early morning of September 2, 2016, five University football players including JD1, JD2, JD4, and JD5 and a recruit engaged in consensual sex with Jane, a University cheerleader. The next day, Jane and her mother told Minneapolis Police these men had sexually assaulted her. Investigators opened a formal investigation and interviewed Jane, who told them her recollection was hazy but she recalled being assaulted by a number of players after consensual sex with JD1 and the recruit. The

investigators interviewed other witnesses, reviewed Jane's sexual assault exam, and spoke with the accused Does. They collected evidence, including two cell phone videos recorded by JD1 that show him, the recruit, and Jane involved in what the investigators described as consensual group sex. At some point, Minneapolis Police informed University Athletic Director Mark Coyle that Jane had accused four players of sexual assault, prompting the University to suspend the players "because of optics." The suspension was lifted after the Hennepin County Attorney received the investigation's findings and declined to file charges.

Jane's allegations came to the attention of the University's Office of Equal Opportunity and Affirmative Action ("EOAA"), the campus department tasked with investigating complaints of student sexual misconduct. The EOAA opened an investigation. On September 23, Jane met with EOAA Assistant Director Tina Marisam, the investigator assigned to the case. Marisam had investigated complaints of sexual misconduct made against football players in 2015 and concluded the failure to corroborate those accusations was due to a cover-up by team members. At the close of the 2015 investigation, then-EOAA Director Kimberly Hewitt emailed then-Athletic Director Norwood Teague and University President Eric Kaler, warning them of a "concerning pattern" of misconduct among football players which posed a risk of future sexual violence and harassment of women on campus.

During her initial interview with Marisam, Jane presented a more detailed version of the events of September 2 than she had provided the police, including a more concrete description of how the alleged assaults involving JD1-5 occurred. This interview led Marisam to investigate JD6-11 who were in the apartment when the alleged assaults occurred. Jane participated in six total interviews with Marisam, who permitted Jane to refine her accusations in response to the Does' individual statements. Marisam allowed only Jane to review a draft narrative for accuracy.

-3-

On October 11, 2016, Marisam sent emails to JD7-10 requesting they come in for interviews. She did not disclose they were targets of an investigation into suspected misconduct. In contrast with her multiple interactions with Jane, Marisam only met once with each accused Doe for fifteen to thirty minutes. Marisam did not record the Does' statements, allow them to review or respond to Jane's statements or the statements from other witnesses, or allow them to confirm the accuracy of Marisam's summary of their statements. Marisam also contacted JD10's girlfriend, a white hockey player, because she was staying with JD10 on September 2. When JD10's girlfriend did not respond to Marisam's interview request, Marisam did not pursue this lead further, unlike her treatment of the Does who did not initially respond to interview requests. At the EOAA's behest, athletic department officials warned the Does that their scholarships were at risk if they did not cooperate with the investigation.

Marisam summarized her findings in a report which the EOAA submitted to the Office of Student Conduct and Academic Integrity on December 7. The report recommended (i) expelling JD1-5 for sexually assaulting or harassing Jane; (ii) suspending JD7, 8, 10, and 11 for one year for sexually harassing Jane; and (iii) placing JD9 on probation for providing false statements about his whereabouts on September 2. It concluded JD6 did not violate the Student Conduct Code.

After receiving the EOAA report, President Kaler ordered Coyle to suspend JD1-5 and 7-11 from the football team, preventing them from participating in an upcoming bowl game. Kaler released public statements regarding the suspensions, assuring the public they were based on facts and University values and served the goal of ensuring a safe campus climate for female students. Reacting to the suspensions, the football team boycotted the pending bowl game to protest a perceived lack of due process afforded the accused players. The boycott prompted criticism from all quarters. Some echoed the team's concerns; others argued the University was obligated to take a tough stance against student sexual misconduct.

In response, Kaler, Coyle, and University Regents met with team members. Kaler offered to lift the suspensions of JD7-11 if they admitted to the accuracy of the report's findings. The players rejected that offer, but the team ended its boycott based on assurances that the accused Does would receive a fair hearing.

Several weeks later, Kaler issued statements to the Minneapolis Star Tribune and St. Paul Pioneer Press declaring that "[t]here's no due process associated with athletic suspensions," and that the University's increased sexual harassment training "didn't seem to make the point" with the Does. The Amended Complaint alleges that Kaler's statements fostered a "lynch mob" mentality towards the Does and contributed to a campus climate of suspicion and hostility toward African-American males. Contributing to this "poisoned well" was public criticism of the University and top-level administrators for alleged mishandling of prior sexual assault complaints by women against white administrators and coaches, and a 2011 "Dear Colleague" letter from the U.S. Department of Education threatening universities with investigations and lost funding if they deficiently investigate campus sexual assaults.

The Amended Complaint alleges the EOAA report contained several troubling features. It found Jane more credible by emphasizing minor inconsistencies in the Does' statements, while minimizing or ignoring her inconsistent statements. It did not recommend punishing Jane for having consensual sex with the underage recruit or for falsely accusing JD6 of sexual assault. It attributed statements to JD11, which he alleges he never made. Finally, the report criticized the Does' purported attempts to conceal evidence from the investigation, while neglecting to mention that Jane withheld evidence from Marisam, including the results of her sexual assault examination and the video of her, JD1, and the recruit engaging in consensual sex.

Dissatisfied with the report's conclusions and their sanctions, the Does invoked the University's due process protections for students accused of sexual misconduct and requested a hearing before the Student Sexual Misconduct Subcommittee

("SSMS"). Comprised of specially trained faculty, academic professionals and students, the SSMS adjudicates sexual misconduct charges involving University students. SSMS panels consist of a non-voting chair and three voting panel members who hear from the accused, consider documentary evidence, and listen to live witness testimony. Panel members and counsel for the accused and the University are empowered to question witnesses.

After a hearing on January 26 and 27, 2017, the SSMS panel concluded: (i) JD1-5 (the players who admitted to having sex with Jane) sexually assaulted or harassed Jane; (ii) there was insufficient evidence JD7-9 and 11 committed sexual misconduct; and (iii) JD10 sexually harassed Jane. The players found guilty appealed to the University provost who affirmed the panel findings as to JD1-5 but reversed the harassment finding against JD10. There were no further appeals within the University or to the Minnesota Court of Appeals.

In June 2018, the Does filed a nine-count complaint against the University (through its Board of Regents), Kaler, and Marisam. Regarding the claims at issue on appeal, the Does asserted Title IX, Title VI, breach of contract, and negligence claims against the University; and equal protection and due process claims against Kaler and Marisam in their official and individual capacities. The Does seek injunctive relief against the University and compensatory damages against the University and Kaler and Marisam acting in their individual capacities. The district court concluded the Does failed to state a plausible claim for Title IX, Title VI, equal protection, and due process relief, and that the University is entitled to Eleventh Amendment immunity from their breach of contract and negligence claims.

## II. Title IX Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Private parties may enforce Title IX through an implied right of action. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 281 (1998) (citation omitted). The parties briefed and the district court decided the sufficiency of the Does' Title IX claims that the University discriminated "on the basis of sex" by applying four alternative theories adopted by other federal courts. See, e.g., Doe v. Miami Univ., 882 F.3d 579, 589 (6th Cir. 2018). However, following the lead of the Seventh Circuit in Doe v. Purdue University, 928 F.3d 652, 667-68 (7th Cir. 2019), we recently adopted a simpler, more straightforward pleading standard for Title IX claims arising from university disciplinary proceedings: "To state a claim, [a plaintiff] must allege adequately that the University disciplined him on the basis of sex -- that is, because he is a male." Univ. of Ark.-Fayetteville, 974 F.3d at 864; see Rossley v. Drake Univ., 979 F.3d 1184, 1192 n.3 (8th Cir. 2020) (noting the Third and Ninth Circuits have adopted the Seventh Circuit's pleading standard), cert. denied, __ S. Ct. __, 2021 WL 1072323 (2021).

A. Discrimination Claims. As in University of Arkansas-Fayetteville, we conclude the Does' lengthy Amended Complaint alleges a number of circumstances which, "taken together, are sufficient to support a plausible claim that the University discriminated against [the Does] on the basis of sex." 974 F.3d at 865. In reaching this conclusion, we must of course assume all factual allegations are true and draw reasonable inferences in the Does' favor.

First, the Does allege that the University was biased against them because of external pressures from the campus community and the federal government over a perceived lack of diligence in investigating and expelling students accused of sexual assault. The Does allege that, in response to the football team's boycott, various groups on campus urged officials to take a tougher stance against campus sexual misconduct which pressured University officials to corroborate Jane's accusations. President Kaler's public statements before the SSMS hearing further "poisoned the

-7-

well" and exacerbated biased attitudes towards male African-American athletes. Additional pressure came from past criticism of President Kaler and the University for an inept response to former A.D. Teague's sexual harassment of multiple staff members. That these pressures influenced the University in this case can be inferred from A.D. Coyle's comment that the players should be suspended when initially accused "because of optics."

In addition, the Department of Education's 2011 "Dear Colleague" letter had criticized federally-funded universities for failing to properly investigate and adjudicate sexual misconduct allegations and adopted changes affecting misconduct investigations including: expanding the definition of sexual harassment, requiring schools to prioritize the investigation of misconduct complaints, and using a "more likely than not" burden of proof in adjudicating those complaints. Institutions that failed to comply risked investigations by the Department's Office of Civil Rights ("OCR") and the potential loss of federal funding. See Purdue Univ., 928 F.3d at 668. The Does allege this potential loss of millions of dollars motivated the University to demonstrate Title IX compliance by skewing investigations against males accused of sexual assault and harassment.

We agree with other circuits that the "Dear Colleague" letter, standing alone, "is obviously not enough to get [the Does] over the plausibility line." Purdue Univ., 928 F.3d at 669; accord Doe v. Univ. of the Scis., 961 F.3d 203, 210 (3d Cir. 2020); Doe v. Univ. of Denver, 952 F.3d 1182, 1192-93 (10th Cir. 2020); see Rossley, 979 F.3d at 1196. But external pressure from public attention and the threatened loss of federal funding "provides a backdrop that, when combined with other circumstantial evidence of bias in [the Does'] specific proceeding, gives rise to a plausible claim" of intentional bias when a female student accused male athletes of sexual misconduct. Doe v. Baum, 903 F.3d 575, 586 (6th Cir. 2018); see Univ. of Ark-Fayetteville, 974 F.3d at 865.

Second, the Does allege historical facts that reinforce the inference of bias in this specific proceeding. In 2014, the OCR investigated the University for potential Title IX violations after charges were lodged that the University discriminated against female athletes by denying them equal funding and resources and by tolerating a male gymnastics coach's sexual harassment of a female gymnast. The University settled the harassment charge by paying the female gymnast $250,000. It is "entirely plausible" that the specter of another federal investigation of potential Title IX violations could motivate the University to discriminate against male athletes accused of sexual misconduct to demonstrate ongoing compliance with Title IX. Schwake v. Ariz. Bd. of Regents, 967 F.3d 940, 948 (9th Cir. 2020).

More specifically, the Amended Complaint alleges internal pressure on University officials to charge male football players with sexual misconduct. It is alleged that investigator Marisam believed football players had covered-up sexual misconduct complaints during a 2015 investigation, motivating her to punish as many players as possible in response to Jane's accusations. After the 2015 investigation, Director Hewitt opined to Kaler and Teague that there was a "concerning pattern" of behavior among the football team, and warned that the players posed an increased risk of committing sexual assault or harassment in the future. It is reasonable to infer that investigator Marisam was aware of and agreed with these sentiments. These allegations support the inference that the University, and specifically its investigators, discriminated against the Does on the basis of sex. See Doe v. Columbia Univ., 831 F.3d 46, 57-58 (2d Cir. 2016) (public criticism of a university's past failure to stop male athletes from sexually assaulting female students supported a plausible inference that the university discriminated against an accused male athlete to deflect additional criticism).

In University of Arkansas-Fayetteville, we concluded that allegations of "a dubious decision" in the misconduct proceeding at issue "taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to

female complainants" were sufficient to state a discrimination claim under Title IX. 974 F.3d at 865-66. Here, the external pressures were if anything greater, and the detailed allegations of investigator bias and dubious investigative procedures in these particular proceedings lend sufficient credence to the inference of discrimination "on the basis of sex." Considering as we must the totality of the allegations in the Amended Complaint, we conclude the Does stated plausible claims that the University discriminated against them on the basis of sex during the misconduct investigation and disciplinary proceedings. The district court concluded that a university's bias in favor of the victims of sexual assault does not establish a reasonable inference of bias against male students, citing Doe v. University of St. Thomas, 240 F. Supp. 3d 984, 991 (D. Minn. 2017). While the circumstances here also give rise to a plausible inference of bias in favor of sexual assault victims rather than against males, "[s]ex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed." Schwake, 967 F.3d at 948; see Columbia Univ., 831 F.3d at 57. Thus, we reverse the district court's dismissal of the Does' Title IX discrimination claims.

B. Retaliation Claims. The Supreme Court held in Jackson v. Birmingham Board of Education that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." 544 U.S. 167, 174 (2005) (emphasis in original). In the Amended Complaint, the Does allege that, when they exercised their right to a hearing on the EOAA charges, the University retaliated against them by making public statements falsely portraying them as having violated the University's Code of Conduct, and by taking actions during the SMSS hearing that were intended to impact their "ability to receive a fair and impartial hearing." The district court concluded the Does failed to state Title IX claims for retaliation. We agree.

To plead prima facie retaliation claims, the Does must allege they participated in activity protected by Title IX, and the University took adverse action against them

because of their participation in that activity.  See Du Bois v. Bd. of Regents of the Univ. of Minn., 987 F.3d 1199, 1203 (8th Cir. 2021); Doe v. Columbia Coll. Chi., 933 F.3d 849, 857 (7th Cir. 2019).  The Does do not plausibly allege that their request for a SMSS hearing was tantamount to a complaint of sex discrimination.  See Du Bois, 987 F.3d at 1204 (citing Jackson, 544 U.S. at 174).  Moreover, even if a request for a hearing made by a person accused of sexual misconduct could amount to protected activity, an issue we need not decide, the Amended Complaint does not plausibly plead prima facie retaliation claims.  Alleged adverse public statements do not satisfy the adverse action element, and the numerous "actions" taken during the SMSS hearing alleged in paragraph 56 of the Amended Complaint -- most of which involved rulings by the hearing panel -- do not plausibly support the conclusory allegation in Count One that the University took actions "that were intended . . . to have an adverse impact on Plaintiffs' ability to receive a fair and impartial hearing."  Thus, the retaliation claims fail as a matter of law.

### III. Race Discrimination Claims

The Amended Complaint asserts two claims that the University discriminated against the Does because of their race, one under the well-established implied private right of action for alleged violations of Title VI, which prohibits discrimination on the basis of race in federally-funded programs, and the other under § 1983 for alleged violations of the Fourteenth Amendment's equal protection clause.  The foundation for these claims is that the University treats white individuals more favorably in the investigation of sexual misconduct accusations.  Both claims require proof of intentional or purposeful discrimination.  See Alexander v. Sandoval, 532 U.S. 275, 280 (2001) (Title VI); Snowden v. Hughes, 321 U.S. 1, 8 (1944) (denial of equal protection).  The district court concluded that, in this type of case, to prove the University's discriminatory intent, the Does must establish "that they were treated differently from others similarly situated."  Creason v. City of Washington, 435 F.3d 820, 823 (8th Cir. 2006) (equal protection claim); see Rowles v. Curators of the Univ.

-11-

of Mo., 983 F.3d 345, 355 (8th Cir. 2020) (Title VI prima facie case requires showing that plaintiff was "treated differently from similarly situated students outside his protected class"). Neither party challenges that conclusion on appeal.

Alleged comparators must be "similarly situated in all relevant aspects." Barber v. C1 Truck Driver Training, LLC, 656 F.3d 782, 797 (8th Cir. 2011). "In a case of alleged discriminatory discipline, such as this, the [Does] must [plausibly plead] that the acts of other[s] . . . who were not disciplined or were disciplined less severely were of 'comparable seriousness' to [their] infraction." Russell v. City of Kan. City, 414 F.3d 863, 868 (8th Cir. 2005) (citation omitted). Count Two of the Amended Complaint alleges in conclusory fashion that the University "treated Plaintiffs less favorably in the investigation and discipline than the University had treated persons of a different race under similar circumstances." The Amended Complaint's nearly forty pages of "Facts" add little of substance to this legal conclusion. It alleges (i) that the University "turned a blind eye" to allegations in 2014 and 2015 of sexual harassment of women athletes and other women by the white male Athletic Director, by a white male volunteer coach, and by "another high-ranking Athletics Department male administrator"; and (ii) that the EOAA did not investigate Jane, who is white, and "a white male football player" present in the apartment that morning.

The district court concluded the Amended Complaint did not plausibly allege a comparator "similarly situated to Plaintiffs in all relevant aspects." It determined the white Athletic Director, coach, and Athletic Department administrator are "fundamentally different than a student" because they are not subject to the Student Conduct Code, and they were accused of sexual harassment whereas the Does were accused of sexual assault. Jane was not similarly situated because no one filed a complaint against her, and the allegation that a white football player "may have been involved" is not sufficient to show that he engaged in the same behavior and was therefore similarly situated to the Does.

-12-

We agree with the district court that in this case, as in Hager v. Arkansas Department of Health, the Amended Complaint "does not allege facts showing that similarly situated [alleged comparators] were treated differently." 735 F.3d 1009, 1015 (8th Cir. 2013). University employees are not similarly situated to students because employees are "treated according to a different behavioral standard." Dartmouth Rev. v. Dartmouth Coll., 889 F.2d 13, 20 (1st Cir. 1989), overruled on other grounds, Educadores Puertorriqueños En Acción v. Hernandez, 367 F.3d 61, 67 (1st Cir. 2004). Regarding the alleged disparate treatment of Jane, it goes almost without saying that a sexual assault complainant and those she accuses of sexual assault are "not similarly situated as complainants." Haidak v. Univ. of Mass.-Amherst, 933 F.3d 56, 74 (1st Cir. 2019). As for the white football player, Jane's hazy recall that "he may have been involved" in the September 2 incident does not show that he was similarly situated. The EOAA investigation determined he was not guilty of sanctionable sexual misconduct and also determined that JD6, an African-American player, did not violate the Student Conduct Code.

In the district court, the Does argued "that the appropriate comparator is any non-African-American male accused of sexual assault, regardless of his role in the University." Like the district court, we reject this contention. As the First Circuit said in Dartmouth Review:

> if we allow a complaint like this to proceed in the context of student discipline, every conclusory selective-enforcement claim would lead to discovery concerning the entire disciplinary history of a college and then to a confusing, unmanageable and ultimately incoherent retrial of every disciplinary decision, including decisions not to investigate.

889 F.2d at 20, quoting Albert v. Carovano, 851 F.2d 561, 574 (2d Cir. 1988) (en banc). Because the Does failed to allege -- beyond legal conclusions couched as factual statements -- that they were treated less favorably because of their race, we affirm the district court's dismissal of their Title VI and equal protection claims.

-13-

## IV. Procedural Due Process Claims

The Does appeal the dismissal of the procedural due process claims alleged in Count Four of their Amended Complaint against President Kaler and Director Marisam in their official and individual capacities. These claims turn on "(1) whether the state actor's decision impacted a protected liberty or property interest, and if so, (2) what process was constitutionally 'due.'" Kroupa v. Nielsen, 731 F.3d 813, 818 (8th Cir. 2013), quoting Mathews v. Eldridge, 424 U.S. 319, 332-33 (1976). The district court dismissed the due process claims of those found responsible for sexual assault and/or harassment, JD1, JD2, JD4, JD5, and JD10, because they failed to exhaust their state remedies. The court dismissed the due process claims of those found not responsible, JD7, JD8, JD9, and JD11, because even assuming these Does had constitutionally-protected interests, they failed to allege a deprivation of those interests because they were absolved of the misconduct charges.[1]

A. Exhaustion of State Law Remedies. Generally, plaintiffs need not exhaust state administrative remedies before filing a § 1983 action. Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 516 (1982). We recognize an exception to this general rule and require plaintiffs to exhaust state remedies before asserting a § 1983 procedural due process claim. "A plaintiff cannot complain of a violation of procedural due process when he has not availed himself of existing procedures." Raymond v. Bd. of Regents of the Univ. of Minn., 847 F.3d 585, 590 (8th Cir. 2017) (quotation omitted). "However, it is not necessary for a litigant to have exhausted available postdeprivation remedies when the litigant contends that he was entitled to *predeprivation* process." Keating v. Neb. Pub. Power Dist., 562 F.3d 923, 929 (8th Cir. 2009) (emphasis in original) (citation omitted). The Amended Complaint alleges

---

[1]The EOAA found that appellant JD6 did not commit sexual misconduct and imposed no punishment. The parties do not address whether he can assert a procedural due process claim, an issue we need not consider.

deprivations of protectable interests occurring both before and after the SMSS hearing.

Count Four first alleges that the Officials deprived the Does of their protected property interests in attending college, their scholarship contracts, and participating in intercollegiate athletics. These are post-hearing deprivations. The claims of those found not responsible were properly dismissed as they were either exonerated by the SMSS panel (JD7-9, 11) or by the University provost (JD10). We agree with the district court that the claims of those held responsible (JD1-2 and 4-5) are barred because they failed to exhaust the "existing procedures" for appealing the University's disciplinary decision by petitioning the Minnesota Court of Appeals for a writ of certiorari, as state law provides. See Zweber v. Credit River Twp., 882 N.W.2d 605, 611 (Minn. 2016); Raymond, 847 F.3d at 590.

In essence, the Does seek to collaterally attack the merits of the University's misconduct findings. "Federal courts are not a forum for general appellate review of university disciplinary proceedings." Univ. of Ark.-Fayetteville, 974 F.3d at 864. Moreover, even if the claims were exhausted, the Does had notice of the SMSS hearing, and the allegations of imperfect hearing procedures fall far short of plausibly alleging they were deprived of an opportunity to respond to the misconduct charges "at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333 (quotation omitted). Students accused of sexual misconduct are not "entitled to a hearing of one's own design." Austin v. Univ. of Or., 925 F.3d 1133, 1139 (9th Cir. 2019).

B. The Alleged Denial of Predeprivation Process. Count Four also alleged pre-hearing deprivations. Exhaustion principles do not preclude these due process claims. See Keating, 562 F.3d at 929. First, Count Four alleged that Marisam interviewed "five of the Plaintiffs" and recommended they be suspended "without having notified Plaintiffs that they had been accused of sexual misconduct." Because Count Four

does not identify the five plaintiffs, allege how long they were suspended, identify how their ability to register for classes and obtain transcripts was allegedly restricted, these claims are not plausibly alleged.  If these were short suspensions, as seems likely, the five Does were at most entitled to minimal due process, including notice of the accusations.  See Goss v. Lopez, 419 U.S. 565, 582 (1975).

Second, Count Four alleged that, after receiving the EOAA's final report, President Kaler ordered Athletic Director Coyle to immediately suspend JD1-5 and 7-11 from the football team, pre-hearing suspensions that deprived them of their right to participate in intercollegiate athletics, including the team's upcoming bowl game,[2] and restricted their ability to register for classes and obtain transcripts. We agree with the district court that Count Four did not plausibly allege that the Does' rights to predeprivation process were unconstitutionally denied.  Even assuming that registering for classes and obtaining transcripts are interests which due process protects, the Does did not identify which of them failed to receive that process.

Count Four also alleged deprivation of the Does' liberty interest in their reputations. Although the predeprivation EOAA report and Kaler's public statements may have stigmatized the Does and injured their reputations, reputational harm alone

---

[2]Federal courts are split on whether participating in intercollegiate athletics is a constitutionally-protected property or liberty interest, an issue we have not decided. See Kroupa, 731 F.3d at 820 and 823 (Bye, J., dissenting).  Even if the "ability to pursue . . . athletic participation" is a protectable interest, an issue we again need not decide, the right was not clearly established at the time the Does were suspended in 2016 and therefore Kaler and Marisam are entitled to qualified immunity from these claims. Austin v. Univ. of Or., 205 F. Supp. 3d 1214, 1221-22 (D. Or. 2016), aff'd, 925 F.3d 1133 (9th Cir. 2019).  The Does do not cite a Minnesota state court decision holding that this activity is "recognized and protected by state law." Paul, 424 U.S. at 710; see G.H. v. Minn. State High Sch. League, No. C2-02-462, 2002 WL 31165068 at *3 (Minn. App. Oct. 1, 2002).

does not implicate an interest protected by the Due Process Clause. See Paul v. Davis, 424 U.S. 693, 711-12 (1976); Kroupa, 731 F.3d at 818.

Accordingly, the district court correctly dismissed the due process claims.

## V. The Eleventh Amendment Immunity Issue

The district court dismissed the Does' state law contract and negligence claims against the University because the University enjoys Eleventh Amendment immunity from suit, citing Treleven v. University of Minnesota, 73 F.3d 816 (8th Cir. 1996). We agree that the court properly applied this binding precedent. The University and its Board of Regents, the named defendant, are immune from suit in federal court. See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't, 510 F.3d 681, 695 (7th Cir. 2007). The Does conceded in the district court that the University is not an entity separate from the State of Minnesota and has not waived its Eleventh Amendment immunity.[3]

The Does argue that the district court committed reversible error when it did not permit them to amend their complaint to assert these claims against Kaler and Marisam under the Ex parte Young exception to Eleventh Amendment immunity. This argument is without merit. The Does' brief in response to the University's claim of Eleventh Amendment immunity did not include a request for leave to amend, so the issue was not preserved for appeal. Moreover, even if preserved, the proposed amendment would be futile because the Ex parte Young exception is limited to official-capacity claims against state officials for *injunctive* relief, and the sole

[3]The Does argue Eleventh Amendment immunity is inapplicable because they are quasi-employees of the University and Congress abrogated state immunity for Title VII suits against governmental employers. The Does did not argue this theory to the district court, so we decline to address it on appeal. See Fleck v. Wetch, 937 F.3d 1112, 1116 (8th Cir. 2019), cert. denied, 140 S. Ct. 1294 (2020).

remedy sought for the Does' breach of contract and negligence claims is damages. See <u>Rowles</u>, 983 F.3d at 357.

The Does further argue the University's athletic department is not entitled to Eleventh Amendment immunity because it is a distinct commercial enterprise. We need not address this issue because the athletic department was not named as a defendant, and Article III does not empower us to offer advisory opinions. The district court properly dismissed the breach of contract and negligence claims.

## VI. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part, and the case is remanded for further proceedings on the Does' Title IX discrimination claims.

_____